Anna Conley
ACLU of Montana Foundation
P.O. Box 9138
Missoula, MT 59807
Telephone: (406) 443-8590
Email: annac@aclumontana.org

Kyle A. Gray
Adrian A. Miller
Holland & Hart LLP
401 N. 31st Street
Suite 1500
Billings, MT 59101-1277
Telephone: (406) 252-2166
Email: kgray@hollandhart.com

Jeffrey A. Simmons
150 East Gilman Street
Madison, WI 53703-1482
Telephone: (608) 258-4267
Email: jsimmons@foley.com
(*Pro hac vice motion to follow*)

Tammy H. Boggs
Foley & Lardner LLP
3579 Valley Centre Drive
Suite 300
San Diego, CA 92130
Telephone: (858) 847-6700
Email: tboggs@foley.com
(*Pro hac vice motion to follow*)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BUTTE DIVISION

DISABILITY RIGHTS MONTANA, INC.,

     Plaintiff,

-vs-

RICHARD OPPER, in his official capacity as
Director of the Montana Department of Public
Health and Human Services, JOHN GLUECKERT,

Civil No. CV-14-25-BU-SEH

**COMPLAINT**

 in his official capacity as Administrator of the
Montana State Hospital; MIKE BATISTA, in his
official capacity as Director of the Montana
Department of Corrections; CATHY REDFERN,
in her official capacity as Health Services Bureau
Chief for the Montana Department of Corrections,
LEROY KIRKEGAARD, in his official capacity as
Warden of Montana State Prison, DR. PETER
EDWARDS, in his official capacity as Staff Psychiatrist
of Montana State Prison, JILL BUCK, in her official
capacity as Mental Health Director of Montana State Prison

      Defendants.

## INTRODUCTION

1.     Individuals with serious mental illness who are incarcerated at the

Montana State Prison ("State Prison" or "Prison") are subjected to a cruel system

that exacerbates, rather than treats and ameliorates, their mental illnesses. At the

Prison, both prisoners sentenced directly to the Department of Corrections

("DOC") and prisoners sentenced to the Department of Public Health and Human

Services ("DPHHS") as "Guilty But Mentally Ill" (sometimes herein "GBMI")

receive substantially inadequate mental health care and are warehoused in solitary

confinement, and are thereby subjected to cruel and unusual punishment in

violation of the Eighth Amendment to the U.S. Constitution.

2.     Individuals sentenced GBMI are also subject to due process violations

contrary to the Fifth and Fourteenth Amendment to the U.S. Constitution. At the

Montana State Hospital ("State Hospital" or "Hospital"), individuals who have

been adjudicated by a court to be Guilty But Mentally Ill, and remanded to the

2

custody of the DPHHS are subsequently transferred to the Prison simply to open up Hospital bed space or to avoid treating prisoners who are disliked by staff, without consideration of the individuals' mental health treatment needs. DPHHS officials and State Hospital staff know that the Prison is not equipped to meet the treatment needs of these individuals and that transfer to the Prison will not best serve GBMI patients' custody, care and treatment needs. Despite this, DPHHS and Hospital staff transfer GBMI patients to the Prison to their detriment without due process.

3.     At the Prison, prisoners with serious mental illness are treated with suspicion and disdain, and their legitimate mental health needs are deliberately ignored. In 2011, the Prison's warden estimated that approximately one-fifth of the Prison's approximately 1,500 prisoners suffer from mental illness, yet the Prison's Mental Health Treatment Unit (sometimes herein "MHTU") has just 12 beds, some of which are regularly kept empty. Prison staff engage in a pattern of cruel and unusual punishment of prisoners with serious mental illness, including: routinely keeping prisoners with serious mental illness locked in solitary confinement 22 to 24-hours a day for months, and in some cases years, which makes their illnesses worse and leads to a cycle of misbehavior and further punishment; depriving prisoners with serious mental illness of clothes, bedding, proper food, and human contact as part of so-called "behavior management plans"

3

that punish prisoners for behavior resulting from their mental illness; deliberately refusing to diagnose prisoners as suffering from mental illness despite clear evidence supporting such diagnoses; deliberately discontinuing prescriptions for necessary mental health medications; and failing to provide any meaningful treatment and therapy for the vast majority of prisoners with serious mental illness. This is a system where punishment without rehabilitation or treatment, is the Prison Defendants' standard practice for prisoners with serious mental illness.

4.     These acts by Defendants violate the prisoners' constitutional rights to due process (under the Fifth and Fourteenth Amendments to the United States Constitution), and to be free from cruel and unusual punishment (under the Eighth and Fourteenth Amendments to the United States Constitution), and prisoners' rights to reasonable accommodations for their mental illnesses under the Americans with Disabilities Act and the Rehabilitation Act.

5.     On behalf of all prisoners with serious mental illness at the Prison, including those sentenced GBMI and subjected to the State Hospital's transfer practices and those sentenced to the DOC, Disability Rights Montana, Inc. brings this action.

## THE PARTIES

6.     Plaintiff Disability Rights Montana, Inc. ("DRM") is a not-for-profit Montana corporation and the authorized protection and advocacy agency for

4

Montana pursuant to the federal Protection and Advocacy for Individuals with Mental Illness Act, 42 U.S.C. § 10801 *et seq.* Among other things, DRM is authorized by federal law to pursue legal, administrative, and other appropriate remedies to ensure that individuals with serious mental illness in state institutions are protected from abuse and neglect.

      7.     Individuals who have received or are receiving mental health services, or their family members, are substantially involved in DRM's governance, including serving on DRM's board of directors, and constitute at least 60 percent of DRM's advisory council.

      8.     Defendant Richard Opper is Director of the DPHHS and at all times relevant to this Complaint was acting within the scope of his employment and under color of state law in his capacity as Director of DPHSS. Director Opper is directly responsible for the transfer of individuals from the State Hospital to the Prison. The DPHHS Director is personally involved in transferring GBMI patients to the Prison without due process. Director Opper is sued in his official capacity.

      9.     Defendant John Glueckert is the Administrator of the State Hospital and at all times relevant to this Complaint was acting within the scope of his employment and under color of state law in his capacity as Administrator of the State Hospital. Defendant Glueckert and his predecessors have been personally

5

involved in transferring GBMI patients to the Prison without due process. Mr. Glueckert is sued in his official capacity.

10.     Defendants Opper and Glueckert are referred to collectively as the "State Hospital Defendants."

11.     Defendant Mike Batista is Director of the Montana Department of Corrections ("DOC") and at all times relevant to this Complaint was acting within the scope of his employment and under color of state law in his capacity as Director of DOC. Director Batista is directly responsible for the administration of the Prison and has authority to direct the housing, discipline, treatment and care of prisoners with serious mental illness at the Prison. Director Batista is sued in his official capacity.

12.     Defendant Cathy Redfern is the DOC Health Services Bureau Chief, and at all times relevant to this Complaint was acting within the scope of her employment and under color of state law in her capacity as Health Services Bureau Chief. Ms. Redfern is sued in her official capacity.

13.     Defendant Leroy Kirkegard is Warden of the Prison and at all times relevant to this Complaint was acting within the scope of his employment and under color of state law in his capacity as Warden. Warden Kirkegard is directly responsible for the administration of the Prison and has authority to direct the

housing, discipline, treatment and care of prisoners with serious mental illness at the Prison. Warden Kirkegard is sued in his official capacity.

14.     Defendant Jill Buck is Director of Mental Health for the Prison and at all times relevant to this Complaint was acting within the scope of her employment and under color of state law in her capacity as Mental Health Director. Ms. Buck has authority to direct the housing, discipline, treatment and care of prisoners with serious mental illness at the Prison. In addition to the acts set forth below, Ms. Buck regularly approves prisoners with serious mental illness for long term housing in solitary confinement and punitive isolation practices such as behavior management plans ("BMPs") discussed below. Ms. Buck approves solitary confinement, 24-hour isolation in disciplinary detention, and BMPs as sanctions for behaviors that are products of mental illnesses. Ms. Buck is sued in her official capacity.

15.     Defendants Batista, Redfern, Kirkegard and Buck have personally participated in providing inadequate mental health treatment to prisoners at the Prison. They have refused to take steps to ameliorate inadequate treatment made known to them by family members of impacted prisoners. They have denied multiple grievances, mental health requests, and/or appeals regarding inadequate mental health treatment. They have direct oversight over all of the Prison practices described in this Complaint.

7

16.    Defendant Dr. Peter Edwards is the staff psychiatrist for the Prison and at all times relevant to this Complaint was acting within the scope of his employment and under color of state law in his capacity as staff psychiatrist. Dr. Edwards has authority to direct the housing, discipline, treatment and care of prisoners with serious mental illness at the Prison. Dr. Edwards is sued in his official capacity.

17.    Director Batista, Warden Kirkegard, Ms. Buck, and Dr. Edwards are referred to collectively as the "Prison Defendants."

### JURISDICTION AND VENUE

18.    This court has jurisdiction of DRM's claims pursuant to 28 U.S.C. §§ 1331 and 1343.

19.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), and is proper in this Division pursuant to Local Rule 3.2(b), *inter alia*, because the unlawful transfers from the State Hospital occurred in Deer Lodge County.

20.    This Court has authority pursuant to 42 U.S.C. 1983 to order injunctive and declaratory relief.

21.    This Court has authority pursuant to 42 U.S.C. §12188 to order injunctive relief to remedy violations of the Americans With Disabilities Act.

8

22.    This Court has authority pursuant to 29 U.S.C. 794a to order

injunctive relief to remedy violations of the Vocational Rehabilitation and Other

Rehabilitation Services Act.

## FACTS

### The Prison's Population Of Prisoners With Serious Mental Illness

23.    Prisoners with serious mental illness make up a large percentage of

the individuals incarcerated at the Prison.  In 2011, the Prison Warden estimated

that approximately one-fifth of the Prison's approximately 1,500 prisoners suffer

from mental illness.  The Prison's staff psychiatrist, Dr. Edwards, has

approximately 275 prisoners on his medication management caseload.

### DPHHS's Procedures For Transferring Prisoners To The Prison

24.    In cases where an individual suffered from a mental disease or defect

or developmental disability at the time he committed a crime, § 46-14-312, MCA

directs a court to sentence that individual to the custody of the Director of DPHHS.

Such sentences are known as "Guilty But Mentally Ill."  § 46-14-312, MCA

requires that the individual be placed in an appropriate facility after considering the

recommendations of treatment professionals.  In practice, most individuals

sentenced GBMI are initially sent to the Forensic Wing of the State Hospital to

receive appropriate mental health care.  Once at the State Hospital, § 53-21-142(2),

9

MCA guarantees patients the "right to the least restrictive conditions necessary to achieve the purpose of commitment."

25.     The Forensic Wing of the State Hospital has only 32 beds, which is insufficient for the number of GBMI individuals sentenced to DPHHS custody.  In some instances, GBMI patients may also reside in other wings of the hospital, such as the Residential Treatment Unit.

26.     Aside from insufficient bed space in the Forensic Wing, the State Hospital has sufficient staff and resources to provide appropriate care to those individuals with serious mental illness that Hospital staff want to treat.  The State Hospital has at least seven full-time psychiatrists available at all times for a population of approximately 209 patients, resulting in a psychiatrist-patient ratio of approximately 1 to 28.  Every GBMI patient is assigned a treatment team, including a psychiatrist or advance practice psychiatric nurse, a social worker and a nurse, and in some cases, a treatment specialist and a recreation therapist.

27.     Under § 46-14-312, MCA, the Director of DPHSS may transfer a GBMI patient to another correctional, mental health, residential or developmental disabilities facility only if that facility "will better serve the [patient's] custody, care and treatment needs."  The DPHHS Director must consider "the recommendations of professionals providing treatment to the defendant and recommendations of the professionals who have evaluated the defendant" prior to

10

ordering the patient's transfer.  In practice, however, the DPHHS Director ignores

the patient's custody, care and treatment needs and, instead, transfers patients to

the Prison simply to open up additional beds at the State Hospital or to get rid of

patients who are disliked by Hospital staff.

28.   Although transfer recommendations are formally made by the

Hospital's Forensic Review Board ("FRB"), that review process is a sham.  With

no semblance of due process, the FRB rubber-stamps decisions already made by

Hospital staff.  Upon information and belief, the FRB has never recommended

against transferring a patient to the Prison.  Upon information and belief, the State

Hospital is so confident of the outcome of FRB proceedings that the Hospital

makes arrangements to transfer patients to the Prison before the FRB has even met.

29.   This reality of the State Hospital's transfer process was captured in a

2007 email from defendant Jill Buck to Prison staff regarding an impending

transfer of GBMI patients to the Prison, in which she wrote: "the Director of

DPHHS wants to clear out as many GBMI's that they can – which means they will

come here.  They heard that we have bed space so they want to fill us up!"

**The Prison's Practices Regarding Prisoners With Serious Mental**

**Illnesses**

30.     Once transferred to the Prison, a GBMI patient's mental health treatment all but disappears and the patient becomes subject to conditions that are far more likely to make his mental illness worse than to make him better.

31.     The Prison also houses many prisoners with serious mental illness sentenced directly to the DOC.  These prisoners encounter the same inadequate mental health treatment and overuse of solitary confinement as GBMI patients transferred to the Prison.

32.     The Prison's treatment of prisoners with serious mental illness is constitutionally defective at every step of the treatment process.  When prisoners arrive at the Prison, the Prison has no meaningful system for identifying, classifying, and monitoring prisoners with serious mental illness.

33.     Prison officials do not know the number of prisoners with mental illness because they have no system to classify and track them.

34.     The Prison has no policy or procedure to define or classify prisoners according to their level of mental health need.

35.     The Prison's initial screening of prisoners with serious mental illness during intake often occurs weeks after admission, which is far too long to identify suicidal prisoners or prisoners in mental crisis.

12

36.     The Prison's level 2 mental health evaluation, which is conducted if a prisoner shows signs of mental illness during the initial screening, sometimes occurs weeks after the initial screening.

37.     The Prison has no policy explaining how the information gathered from prisoners at intake should be processed or utilized, whether it should be taken into account when determining housing, custody level, or programming, or who should receive copies of the information.

38.     The Prison does not create comprehensive treatment plans for prisoners with serious mental illness.

39.     The Prison has no system for auditing, evaluating or ensuring the effectiveness of its purported mental health care program.

## MSP Mental Health Staff Mis-Diagnose Prisoners as "Faking" Mental Illness

40.     MSP mental health staff, including Defendants Buck and Edwards, engage in a policy and practice of mis-diagnosing prisoners as feigning mental illness, and characterizing their behavior as manipulative, rather than a product of mental illness. As a result, a culture of suspicion, derision and mistrust toward prisoners with serious mental illness is prevalent at the Prison. This has wide-reaching ramifications for prisoners with serious mental illness, including increased custody levels, restrictive housing, disciplinary actions and sanctions,

13

decreased access to education and programming, and a lesser chance of receiving parole once eligible.

41.     The Prison's only psychiatrist, Dr. Peter Edwards, believes that most prisoners with serious mental illness are either "faking it" or untreatable.  During a 2013 panel discussion at the Prison for a legislative committee, Dr. Edwards stated that the majority of prisoners at the Prison, who people outside the Prison perceive as mentally ill, actually have untreatable personality disorders and "don't want to change."

42.     As a result of his extraordinary indifference to the mental health conditions of the prisoners he is charged with treating, Dr. Edwards deliberately refuses to diagnose prisoners as having mental illness, even where the prisoners have well-documented histories of such illnesses.  Instead, Dr. Edwards commonly diagnoses prisoners as "malingering," meaning the prisoner is supposedly feigning mental illness to obtain some other benefit.

43.     Dr. Edwards also engages in a pattern of deliberately discontinuing medications that prisoners have taken for years to treat their mental illnesses.  Dr. Edwards regularly discontinues medications without considering the effect it will have on their mental illness.

### The Prison's Use Of Solitary Confinement To Address The Behavioral Problems Of Prisoners With Serious Mental Illness

14

44.     Rather than diagnosing, treating, and monitoring prisoners with serious mental illness, the Prison Defendants use solitary confinement—keeping prisoners isolated in cells for 22 to 24 hours a day for weeks and even months and years at a time—as a common means for addressing the behavioral problems associated with prisoners with serious mental illness. The Prison Defendants subject prisoners to solitary confinement without regard to whether prisoners' behavior is a product of their mental illness or the effect that solitary confinement will have on their mental health.

45.     The Prison has approximately 200 solitary confinement cells located in two "Locked Housing" units. Within Locked Housing there are various degrees of solitary confinement involving different levels of isolation and sensory deprivation. Even the most lenient forms of solitary confinement imposed by the Prison Defendants are detrimental to the health of prisoners with serious mental illness.

46.     The cells in Locked Housing are small, concrete single-person cells.

47.     The cell doors in Locked Housing are solid metal with a small window and a food slot. Prisoners receive meals through the food slot and eat all of their meals in isolation in their cells.

15

48.     While in Locked Housing cells, prisoners experience little or no natural light. The cells in Locked Housing have only one small window, some of which are frosted or covered with metal.

49.     It is common for prisoners in solitary confinement to hear screaming, crying or other disturbing noises by other prisoners who have serious mental illness and are psychotic or decompensating.

50.     Prisoners in solitary confinement experience little human interaction. Prisoners have little ability to speak to or see other prisoners. All prisoners in solitary confinement are placed in restraints whenever they are moved from their cell.

51.     Prisoners with serious mental illness who are placed in solitary confinement receive no therapy for their mental illness. The primary contact with mental health staff while they are in solitary confinement consists of weekly rounds by mental health technicians. Each visit during weekly rounds typically lasts no more than a few minutes and is conducted at the prisoner's cell door, where other prisoners and corrections offices can hear what is said. As a result, prisoners with serious mental illness are often reluctant to share their mental health concerns during those rounds. The futility of this process causes prisoners with serious mental illness to suffer additional stress.

52.     The least restrictive level of solitary confinement is known as "Max Population" or Levels 4 and 5 of "Administration Segregation" or "Ad Seg." At Levels 4 and 5, prisoners are isolated in their cells at least 22 hours a day five days a week, and 24 hours a day two days a week. The out-of-cell time for a prisoner confined to these levels consists of one hour per day alone in a dayroom adjoining his cell, and one hour per day in a small outdoor caged area by himself. If a prisoner is not feeling well or does not wake up during the designated one-hour recreation period, which is often the case for prisoners with serious mental illness, the prisoner may not receive his one hour of outdoor time.

53.     Prisoners in levels zero (0) through three (3) of Ad Seg are in their cells 23 hours per day five days a week, and 24 hours a day two days per week. The one hour of outdoor recreation time occurs in one of two outdoor areas, depending on the housing unit. One is a caged area linked to other caged areas attached to the housing structure, and the other is a small, cement-walled area that has a metal grate for a roof. At Level 0, prisoners receive no visits, one phone call per month after 30 days of clear conduct, and cannot engage in cell study or hobby, such as art. At Level 1, prisoners may make just two phone calls per month, and are allowed just one visit every other week. At Level 2, prisoners may make just three calls per month and may have just one visit per week.

17

54.     In a more restrictive form of solitary confinement, referred to as
"Restricted Ad Seg," prisoners are kept in their cells 23 hours per day and
experience heightened isolation.  A prisoner in Restricted Ad Seg is ineligible for
phone calls for the first 60 days.  Restricted Ad Seg is broken into four levels, A –
D, with A being the most restrictive.  In Levels A and B, prisoners may not make
phone calls or have visitors for the duration of time they remain on those levels.
Prisoners who advance to Level C are entitled to one, fifteen minute phone call per
month to immediate family members only.  Prisoners are ineligible for visits until
they receive 90 days of clear conduct.  Prisoners receive one hour of outside
recreation five days a week, however, if a prisoner is not feeling well or does not
wake up during the designated one-hour recreation period, he may not receive his
one hour of outdoor time.

55.     Among the most extreme forms of solitary confinement imposed at
the Prison is "Disciplinary Detention," which is better known among prisoners and
Prison staff as "The Hole."  The Hole is total isolation.  Prisoners sent to The Hole
are subjected to 24-hour isolation in their cell.  Some cells used for The Hole have
blacked-out windows, resulting in a total absence of natural light.  Prisoners placed
in The Hole are prohibited from having any reading materials for the first several
days of detention, then subsequently have substantially restricted reading
privileges.  They cannot make phone calls or have visitors.  They cannot

18

participate in religious services or rehabilitative treatment programs. They receive

no mental health therapy. They receive no indoor or outdoor recreation time

whatsoever. The only out-of-cell time given to prisoners in The Hole consists of

three, ten-minute showers per week.

56.     Although the Prison's formal policies prohibit a prisoner from

spending more than 30 consecutive days in The Hole, Prison staff render that rule

meaningless by transferring prisoners to other forms of solitary confinement for

short periods of time at the end of 30 days and then returning the prisoner to The

Hole for another 30 days. The Prison Defendants are aware of this practice.

57.     The Prison regularly places prisoners with serious mental illness in all

of the forms of solitary confinement described above for weeks and months at a

time. Some prisoners with serious mental illness have spent years in various forms

of solitary confinement during their time at the Prison.

58.     Subjecting prisoners with serious mental illness to these forms of

solitary confinement is dangerous to the prisoners' health. Prisoners with serious

mental illness who are subjected to solitary confinement have no means of

controlling the symptoms of their illness. They are left utterly alone with few

positive distractions and, as a result, may obsess on their own disordered thoughts

and become increasingly more ill, known as "decompensating." Prisoners with

serious mental illness have stated that spending months in solitary confinement at

19

the Prison causes them to experience anxiety and paranoia, increased hostility, and increased depression. Prisoners experiencing auditory and visual hallucinations have stated that their hallucinations become more intense while they are in solitary confinement at the Prison. One prisoner with serious mental illness explained that being placed in solitary confinement makes him feel like a young child locked in a closet with nothing to do and, as a result, he spreads feces on the walls of his cell to keep bad spirits away.

59.    Even when prisoners with serious mental illness are able to keep their outward behavior under control, long periods of solitary confinement cause the prisoners to lose their ability to interact with people and they become afraid to reintegrate into the general prison population and society. The Prison Defendants may view such pacification as "success" but, in fact, they are causing long-term harm to the prisoners' mental health.

### The Prison's Use Of "Behavior Management Plans" To Punish Prisoners With Serious Mental Illness

60.    In addition to solitary confinement, the Prison Defendants also subject prisoners with serious mental illness to "Behavior Management Plans" ("BMPs") that punish prisoners for behavior that is a product of their mental illness, such as self-mutilation and smearing of feces on cell walls. BMPs are an extreme form of punishment in which prisoners are kept in 24-hour isolation and deprived of the most basic elements of civilized life. In 2003, the Montana Supreme Court held

that BMPs, in conjunction with other aspects of solitary confinement and inadequate mental health treatment, violate the Montana Constitution. Regardless, the Prison Defendants continue to routinely utilize the practice for prisoners with serious mental illness.

61. A prisoner on a BMP starts out by having all of his prison clothing removed and being given just a mattress, blanket, and a suicide smock. At the start of a BMP all meals consist of a tasteless loaf of food ("nutraloaf") delivered on a paper towel, and the prisoner is not allowed any running water in his cell. A guard must flush the toilet for the prisoner, and ask for water to wash his hands. In extreme forms of BMPs, prisoners must go to the bathroom through a grate on the floor.

62. Prisoners on BMPs can progress to less punitive levels of BMPs only by conforming their behavior to prison rules. But for prisoners with serious mental illness this can be impossible, as their illnesses makes it difficult or impossible for them to modify their behavior and they cannot comprehend the "logic" behind the BMP system. As result, BMPs exacerbate the prisoners' mental illness and lead to further punishment for misbehavior.

63. The Prison Defendants place prisoners with serious mental illness on BMPs as a matter of course, without modifying the BMPs in any way to account for the previous failures of the BMPs to correct the prisoner's behavior. BMPs are

21

not an evidence-based practice. The Prison Defendants do not track whether BMPs actually work, or change behavior for specific prisoners or for the prison population generally.

64.     Prison mental health staff do not take steps to prevent prisoners with serious mental illness from being placed on BMPs. In some instances, Prison mental health staff have encouraged the use of BMPs on prisoners with serious mental illness.

65.     Although the Prison's formal policies call for Prison mental health staff to assess a prisoner's mental health status before allowing a prisoner to be placed on a BMP, that process is a sham. Prison policies require mental health staff to certify that "[t]he inmate's present behavior is not the direct result of an Axis I serious mental disorder." Because the Prison's psychiatrist, Dr. Edwards, deliberately refuses to diagnose prisoners as having Axis I serious mental disorders, the BMP certification process is a meaningless "check-the-box" exercise. Even where prisoners are diagnosed with an Axis I disorder, Prison mental health staff conclude that the prisoner's behavior was not a direct result of that disorder. Upon information and belief, Prison mental health staff have never certified that a prisoner's behavior was the direct result of an Axis I serious mental disorder.

66.     Prison mental health staff "clear" prisoners to be placed on BMPs for six-month periods.  During the six-month period, a prisoner can be placed on a BMP without input from mental health staff.  During an inspection of the Prison by DRM's psychiatric expert, Prison staff could not identify a single instance in which mental health staff intervened to discontinue a BMP.

67.     Rather than protect prisoners with serious mental illness from the damaging effects of BMPs, mental health staff sometime encourage the use of BMPs for such prisoners.  In one instance, defendant Buck wrote to prison staff that two individuals sentenced as Guilty But Mentally Ill would be "good candidates" for BMPs at the Prison.

### The Prison Fails To Properly Address The Health Care Needs Of Prisoners With Serious Mental Illness

68.     Prisoners with serious mental illness at the Prison receive little, if any, meaningful interaction with mental health clinicians.  The Prison offers group therapy with mental health staff to only a very small percentage of the prisoners with serious mental illness, none of whom are in solitary confinement.  An even smaller percentage of prisoners with serious mental illness receive individual therapy at the Prison.

69.     For the vast majority of prisoners with serious mental illness, their interaction with mental health staff at the Prison consists of non-confidential weekly cell checks by mental health technicians at the cell door.  Prisoners' written

23

requests for additional mental health care are regularly denied. The futility of requesting additional mental health care exacerbates prisoners' mental illnesses.

70.   The Prison Defendants fail to respond appropriately to threats of suicide by prisoners with serious mental illness. The Prison's most common response to a prisoner expressing thoughts of suicide is to place a prisoner on a BMP. This response causes prisoners to be reluctant to admit to thoughts of suicide and, as a result, increases the risk of suicide.

71.   In at least one known instance, Dr. Edwards dismissed a prisoner's statement about a previous suicide attempt, and the prisoner died shortly thereafter of what is believed to be a drug overdose.

72.   The Prison does not have an adequate number of trained mental health staff to provide adequate mental health care to its prisoners. The Prison has 19 mental health staff positions to provide services to approximately 300 prisoners with serious mental illness. Many of those positions are perpetually vacant. The Prison has had a 75% turnover of its mental health staff during the last two years.

73.   The majority of requests for mental health services by prisoners are addressed by the Prison's six mental health technicians. The only educational requirement for the mental health technicians is a high school diploma. Despite the lack of training, qualifications and education these individuals receive, they are

responsible on the "front lines" for mental health treatment of prisoners with serious mental illness in solitary confinement.

74.     Even the Prison's Mental Health Treatment Unit has inadequate therapy and counseling for prisoners fortunate enough to be placed there.

75.     The Prison's corrections staff members receive just a four-hour class on mental health issues each year.

### Examples Of The Experiences Of Prisoners With Serious Mental Illness

76.     Below are examples of the experiences of several prisoners with serious mental illness at the State Hospital and the Prison.

#### Prisoner No. 1

77.     Prisoner No. 1 is a 50-year-old who has spent most of his life in correctional institutions and psychiatric hospitals.  He has been committed to the State Hospital on seven occasions.  In 2006, Prisoner No. 1 was sentenced Guilty But Mentally Ill and given a 15-year sentence to DPHHS.  Among the reasons the Judge gave for the sentence was that "[t]he Defendant has substance and mental health issues and [DPHHS] is the best facility to address those conditions."

78.     DPHHS placed Prisoner No. 1 at the State Hospital, where he was diagnosed as schizophrenic and put on antipsychotic medications.  Prisoner No. 1 resided at the State Hospital's Residential Care Unit for some time, during which

staff described him as "polite, friendly, cooperative, and socializing appropriately with staff and peers."

79.     The attitude of Hospital staff toward Prisoner No. 1 changed after they suspected him of stealing another patient's jewelry. Hospital staff transferred Prisoner No. 1 to the Hospital's forensic wing. The Hospital's Forensic Review Board then voted to recommend that the DPHHS Director transfer Prisoner No. 1 to the Prison. The Acting Director of DPHHS approved the transfer. The FRB stated that Prisoner No. 1's "mental disease, [s]chizophrenia, has been stabilized with medications, and that he has achieved maximum hospital benefit." The FRB stated, "[I]t is believed his needs will be better served at [the Prison]." The Prison's mental health director, Ms. Buck, gave a different reason for the transfer. She told Prison staff that "the Director of DPHHS wants to clear out as many GBMI's that they can – which means they will come here. They heard we have the bed space so they want to fill us up!"

80.     Prisoner No. 1 arrived at the Prison in 2008. From 2008 to 2012, Prison mental health staff repeatedly acknowledged his diagnosis of schizophrenia and he was prescribed multiple antipsychotic medications. Despite that diagnosis, Prison staff placed Prisoner No. 1 in solitary confinement and subjected him to BMPs for threatening self-harm. Prisoner No. 1 told Prison mental health staff that he wanted to cry when he was in solitary confinement and that he did not "do hole

26

time well." He said that in solitary confinement "all I do is suffer unmitigated hell in these cells all the time."

81.     In 2012, Dr. Edwards began meeting with Prisoner No. 1. After their second meeting, Dr. Edwards discontinued Prisoner No. 1's prescription for the antipsychotic medication Risperdal. In his notes of the meeting, Dr. Edwards wrote, "I'm rather skeptical that this man has any kind of chronic disorder" and "he is probably not mentally ill either." Six months later, Dr. Edwards wrote, "I am absolutely convinced this man is malingering," and decided to taper off Prisoner No. 1's antipsychotic medications with the goal of discontinuing them completely. Dr. Edwards speculated that Prisoner No. 1 "will act out in some way to supposedly prove his mental illness, but I will alert the whole mental health staff about this at our next meeting."

82.     Prisoner No. 1 exhausted his administrative remedies regarding inadequate mental health care at the Prison. In response to Prisoner No. 1's appeal, the DOC Director wrote, "my review finds the matter has been given an appropriate level of attention by medical staff. I find no grounds for overturning prior decisions."

83.     Prisoner No. 1 currently reports having a progressively harder time managing his hallucinations and disorganized thoughts without proper medication.

His is convinced that Dr. Edwards and other mental health staff are torturing him in exchange for large sums of money.

**Prisoner No. 2**

84.    Prisoner No. 2 is a 43-year-old prisoner with a long history of mental illness, including diagnoses for psychotic disorders.  Prisoner No. 2 has a full IQ of 78, which places him in the borderline range of intellectual functioning.  He has been admitted to multiple psychiatric hospitals and attempted suicide several times.

85.    In 2002, a district court judge found Prisoner No. 2 Guilty But Mentally Ill of a felony and misdemeanor, and committed him to DPHHS "for placement at [the State Hospital] for a period of fifteen (15) years."  At the State Hospital there was no evidence that Prisoner No. 2 was a danger to other patients or staff; he participated in required therapy groups, and even resided on the less-restrictive Residential Care Unit.  However, State Hospital staff found Prisoner No. 2's personal hygiene offensive.

86.    In 2007, State Hospital staff attempted to place Prisoner No. 2 in a community group home.  When the effort to release to Prisoner No. 2 to the community failed, Hospital staff decided instead to transfer him to the Prison.  On July 23, 2007, a DPHHS employee emailed a Prison employee, informing him that Prisoner No. 2 was being transferred to the Prison for "non-complaint [sic]

with treatment." Afterward, on July 26, 2007 the Forensic Review Board voted unanimously to recommend that the DPHHS Director transfer Prisoner No. 2 to the Prison "where it is believed his needs will be better served" because "he has achieved maximum hospital benefit." On August 2, 2007, the acting DPHHS Director issued a memo transferring Prisoner No. 2 to the Prison.

87.     Since arriving at the Prison, Prisoner No. 2 has spent over three years in solitary confinement for "bizarre" and "disruptive" behavior. For two months, Prisoner No. 2 was placed in the Prison's MHTU, where mental health staff concluded that, although Prisoner No. 2 was previously diagnosed with serious mental illness, his problems were behavioral and stemming from immaturity and other unknown sources. As a result, Prisoner No. 2 was transferred back to solitary confinement. Staff in the Prison's Locked Housing Unit have repeatedly tried to get Prisoner No. 2 moved back to the MHTU, but MHTU staff refused to accept him.

88.     Prison staff have continuously refused to consider Prisoner No. 2's mental illness and developmental disabilities when addressing his behavior. Prison staff have placed Prisoner No. 2 on BMPs approximately 25 time for acts including actual and threatened self-harm, smearing feces in his cell, banging his head until it bled on his cell door while asking for real food instead of nutraloaf, crying and saying people on the floor were talking to him, attempting suicide,

29

cutting himself with a broken deodorant stick, and hitting his cell door and screaming "help me help me" for 20 minutes. Prisoner No. 2 has spent weeks in 24-hour isolation in disciplinary detention similar behaviors.

89.    In 2012, Prison mental health staff discontinued Prisoner No.2's antipsychotic medications, which he had taken for many years, after he temporarily refused to take them. Prisoner No. 2's subsequent requests for medications were denied. While unmedicated, Prisoner No. 2 was found guilty of multiple rule violations for bizarre behavior and self-harm and subjected to BMPs, disciplinary detention and administrative segregation.

90.    In July 2012, Dr. Edwards first met with Prisoner No. 2 and concluded, "In my opinion this man is simply malingering." Dr. Edwards wrote, "[if] he is able to articulate in a more appropriate fashion what he thinks is wrong with him it might be appropriate to try him on an antidepressant. However, today he was bordering on being out of control and so in the end I did not start him on anything at this time."

91.    In a 2013 meeting, Dr. Edwards laughed at Prisoner No. 2 after he voiced negative symptoms from being unmedicated. When Prisoner No. 2 called Dr. Edwards a "prick," Dr. Edwards threatened to send Prisoner No. 2 to 24-hour lock down unless he apologized, and diagnosed Prisoner No. 2 as malingering and removed Prisoner No. 2 from his medication caseload.

**Prisoner No. 3**

92.    Prisoner No. 3 is 33 years old and has been on medications for mental health issues since he was a child.  He has received diagnoses of serious mental illness throughout his life, including major depressive disorder.

93.    Prisoner No. 3 has a long history of extreme self-harm  He has cut himself on numerous occasions, resulting in hospitalizations and near loss of life due to blood loss.  In addition to cutting himself, he has also bitten through his own skin, ripped stitches, and reopened wounds with foreign objects.  Prisoner No. 3 described self-harm impulses as coming over him "like a wave" that he is unable to resist.

94.    Prisoner No. 3 has been transferred between the State Hospital and the Prison many times.  In 2006, Prisoner No. 3 was found Guilty But Mentally Ill for a parole violation and sent to the State Hospital.  During his stay at the Hospital he engaged in several instances of self-harm, including cutting himself with a razor and jamming screws and pencils into his arms and wounds, and sucking and biting on the injured area.

95.    In 2006, the Forensic Review Board recommended that Prisoner No. 3 be transferred to the Prison, concluding that he "has showed no overt indications of mental disease or defect."  The DPHHS Director adopted the FRB's recommendation and concluded that Prisoner No. 3 was "in need of long term

31

behavior management in a more secure environment that can better protect him from the everyday items he uses to harm himself with" and recommended that the Prison continue his medications.

96.    Prisoner No. 3 spent two months in the MHTU at the Prison. While in the MHTU, he filled out a "treatment planning worksheet," in which he listed the following ways Prison mental health staff could help him:  "Be there to talk to me when I'm having problems.  Groups with homework.  Give me stuff to do so I can keep myself and my mind busy."

97.    Instead of giving Prisoner No. 3 the simple forms of help he requested, Prison staff transferred him to solitary confinement because the MHTU could not manage his self-harm behavior.  Despite his sentence of GBMI sentence and previous diagnoses of mental illness, Ms. Buck concluded that Prisoner No. 3 had "no mental health history that would preclude an ad seg placement."

98.    At one point, Prison mental health staff discontinued Prisoner No. 3's medications, based on the staff's conclusion that "he appears to do as well/poorly, whether on or off Rx."

99.    The Prison's most common response to Prisoner No. 3's acts of self-harm is to place him on a BMP.  He has spent significant periods of time on BMPs in 24-hour isolation, often in a padded cell.  Prison staff have used force, including pepper spray, repeatedly on Prisoner No. 3 to extract him from his cell

32

when he is engaging in self-harm. The longer he spent in solitary confinement and on BMPs, the worse his self-harm episodes became.

100. In July 2011, Prisoner No. 3 stated to Prison mental health staff that he had "been in locked housing for way too long" and was "wound up," "stressed," and worried about doing "something stupid" that would get him into trouble.

101. Upon being moved out of solitary confinement, in August 2011, Prisoner No. 3 murdered another prisoner. Prisoner No. 3 was found guilty of homicide and sentenced to the DOC for life without the possibility of parole.

### Prisoner No. 4

102. Prisoner No. 4 was diagnosed with bipolar disorder and schizophrenia and received various medications for those illnesses before arriving at the Prison. When the Judge sentenced him to the Prison, she recognized Prisoner No. 4's mental health issues and "highly recommend[ed] that he be considered for placement in the mental health block at the Prison "because that seems to me that that's going to be the best pace for [him]." The Judge told Prisoner No. 4, "I would like to see things get turned around for you . . . . [Y]ou need . . . to find a person at [the Prison] that you can rely on, a person that is an employee of the [P]rison in the mental health block to be the person you look to getting answers as to how you need to act . . . ."

33

103. Despite the Judge's express recommendation, Prisoner No. 4 was never placed in the MHTU at the Prison. Prison records suggest that Prisoner No. 4 spent more than half of his time at the Prison in solitary confinement. The Prison's mental health staff stated that Prisoner No. 4 had "no known history of psychiatric problems or symptoms that would preclude Administrative Segregation for inappropriate behavior."

104. Within weeks of arriving at the Prison, Prisoner No. 4 told staff that he was hearing voices telling him to do things to himself and he threatened to kill himself. Shortly thereafter, Prisoner No. 4 was disciplined for smearing feces on himself, but a Prison therapist concluded that the conduct was not the result of a serious mental illness. A little more than a month later, Prisoner No. 4 was disciplined for banging his head against the wall and spreading feces on himself. In response, Prison mental health staff authorized placing Prisoner No. 4 in solitary confinement and authorized the use of a BMP. During his seven months at the prison, Prisoner No. 4 met with Dr. Edwards just once, more than four months after his arrival.

105. Seven months after arriving at the Prison, Prisoner No. 4 was found dead in his cell as a result of hanging.

**Prisoner No. 5**

34

106.   Prisoner No. 5 is 62 years old and was diagnosed with multiple serious mental illnesses before arriving at the Prison, including schizophrenia. Prisoner No. 5 hears the voice of a dog named Gene who directs him to harm himself.  Prisoner No. 5 has repeatedly attempted to take out his own eyes.

107.   Despite his previous diagnoses of serious mental illness, the Prison Defendants refuse to acknowledge that Prisoner No. 5 is mentally ill.  Prison mental health staff have described Prisoner No. 5's attempts to take his own eyes out and swallow objects as "manipulative" and "characterological," rather than symptoms of mental illness.  In 2012, Ms. Buck dismissed Prisoner No. 5's statements about suffering visual hallucinations, stating: "it was obvious that he was making this stuff up as he went along – he isn't delusional, it was deliberate."

108.   In 2012, Prisoner No. 5 began meeting with Dr. Edwards, who wrote, "I was informed that at some point the state hospital thought he was schizophrenic, however he does not appear to me to have anything that would necessarily be consistent with schizophrenia."  Dr. Edwards also wrote, "He claims to have an imaginary friend that he talks too [sic] and I'm highly skeptical of such complaints as this and would really not see this as being a thought disorder i.e., any kind of psychotic symptomatology.  I would rather feel that he is in fact malingering."

109.   In December 2012, Dr. Edwards discontinued all of Prisoner No. 5's medications for noncompliance without meeting with Prisoner No. 5 or

35

investigating possible reasons for noncompliance.  Prisoner No. 5's stated reason

refusing to take his medications was "the outerspace people and Gods and I don't

need any mental health medication."  Subsequently, Prisoner No. 5 received

approximately 40 disciplinary violations, which Prison custody staff attributed to

"medication noncompliance."

110.    Throughout 2013, Prisoner No. 5 engaged in self-harm and exhibited

behavior that reflects paranoid and delusional beliefs.  In April 2013, Dr. Edwards

put him on an antipsychotic medication to treat Prisoner No. 5's behavior, rather

than a mental illness.  Dr. Edwards described Prisoner No. 5 as talking "nonsense

in an effort to try to fake being psychotic."  Dr. Edwards went on to explain,

"[Prisoner No. 5] is current in the Max for smearing feces all over his wall that he

claims was 'an alien spaceship.'  Here again though, if one does not take into

account the content of what he says, there is no evidence of a thought disorder. . . .

I told him that I would see what his behavior is next week and if he stops

threatening suicide, stops being manipulative, stops acting out that I would

consider switching him to oral Haldol."

111.    Prison mental health staff have repeatedly approved standard

disciplinary measures for Prisoner No. 5's behavior for many years.  Since 2005,

Prisoner No. 5 has spent years in solitary confinement at the Prison.  He reports

feeling like a "young kid locked up in a closet" when he is in solitary.  He spreads

feces in his cell to "keep bad spirits away," and engages in self-harm.  He has been repeatedly disciplined and restrained for self-harm and behavior such as smearing feces, drinking Ajax, and swallowing glass.

### Prisoner No. 6

112.    Prisoner No. 6 has long-standing diagnoses of mental illness, including bi-polar disorder, post-traumatic stress disorder, and major depression. For many years, Prisoner No. 6 has taken lithium for his bi-polar disorder, as well as antidepressants and antipsychotic medications.

113.    Prisoner No. 6 was assigned to the Prison's MHTU on a few occasions, but his requests to return to the MHTU were denied because Prison staff concluded that his "mental illness diagnosis does not meet the criteria."

114.    The Prison Defendants have repeatedly ignored Prisoner No. 6's mental illnesses when addressing his behavior and making his housing assignments.  Prisoner No. 6 has spent more than eight years in solitary confinement.  In solitary confinement, Prison mental health staff have observed Prisoner No. 6 decompensating.  After years in solitary confinement, Prisoner No. 6 has expressed concern regarding his ability to reintegrate into the general prison population.

115.    Prison staff have repeatedly placed Prisoner No. 6 in 24-hour isolation on BMPs for threatening to slice his throat, threatening to stab himself with pens,

biting his arm and wrist and smearing the blood on the floor "to make the situation look worse than it actually was," smearing blood on his cell, and writing a message in blood about wanting to die. Prison staff have used a tazer gun and pepper spray to force Prisoner No. 6 to come out of his cell.

116.   Prison mental health staff refuse to acknowledge the existence of Prisoner No. 6's mental illness. In 2012, mental health staff concluded that Prisoner No. 6 was biting and picking at his arm "for the purpose of manipulating staff and receiving mental health services at his leisure." They also concluded that his act of smearing blood on walls was "malingering his depression to gain attention."

117.   Prison staff are deliberately indifferent to the harmful effect of solitary confinement on Prisoner No. 6. In a 2011 document, Prison staff wrote that they were placing Prisoner No. 6 in solitary confinement with the goals of: "learn to deal with depression," "learn to refrain from this type of behavior by working on his 'people skills' and thinking before he reacts," and finding ways to "occupy his mind."

118.   After meeting with Prisoner No. 6, Dr. Edwards wrote, "I think most of his complaints were involving being in locked housing but I explained to him that there wasn't anything I could do about that."

119.   When Prisoner No. 6 expressed frustration that Dr. Edwards was not trying to get to know him, Dr. Edwards wrote: "getting to know him is really not my job but rather medication management is what my job is."

120.   Dr. Edwards' approach to medication management consisted of discontinuing the medication Prisoner No. 6 had been using to control his mental illness.  In 2012, Dr. Edwards concluded that Prisoner No. 6 did not have bipolar disorder, despite previous diagnoses of that illness.  Dr. Edwards then discontinued Prisoner No. 6's lithium prescription.  Prisoner No. 6 repeatedly asked to be restarted on lithium.  In one request he wrote, "I need help not put on a shelf or really put in a cell 24/7 to hurt and feel hopeless and frustrated."  Dr. Edwards characterized those requests as "gamey" manipulation and wrote to Prisoner No. 5, "Unless you have evidence of mania (and you never have) I will not restart you on lithium" and "I will not restart you on Lithium because you do not have Bipolar disorder."  In his notes, Dr. Edwards wrote, "I think this man has too much suicide potential to be placed on something that would kill him anyway."

**Prisoner No. 7**

121.   Prisoner No. 7 is 70 years old and has received several mental illness diagnoses during his life, including schizophrenia, bi-polar disorder, major depression and personality disorders

39

122. Prisoner No. 7's mental illness manifests itself in, among other things, numerous acts of extreme self-mutilation. Over many years, Prisoner No. 7 has swallowed safety pins, razor blades, paper clips, needles, spoons, nails, tacks. He has also inserted objects into his penis, including paper clips, foil and copper wires. Prisoner No. 7 has had over 30 stomach surgeries for swallowing foreign objects.

123. Prison staff view Prisoner No. 7's acts of self-harm as "manipulative" and "not the result of serious mental illness." Prison staff have housed Prisoner No. 7 in solitary confinement for several years, and have placed him on BMPs numerous times in response to his acts of self-harm.

124. From approximately 2005 to 2012, Prisoner No. 7 was prescribed a combination of medications that worked well for him, including Prozac, Lithium, Seroquel and Propranolol. During this time he engaged in few self-harm behaviors and worked as a janitor in the prison.

125. This all changed when Dr. Edwards began seeing Prisoner No. 7. Despite Prisoner No. 7's consistent, historic diagnoses of major depression, Dr. Edwards concluded: "Axis I: Chart states major depression, but I don't see any evidence for that." Three months later, Dr. Edwards diagnosed Prisoner No. 7 with no Axis I mental health disorder.

126. In December 2012, Dr. Edwards wrote "it's my understanding that [Prisoner No. 7] used to be quite a behavioral problem and he has been better

behaviorally on this particular med regimen." Despite this, the following month Dr. Edwards discontinued all of Prisoner No. 7's medications because he had failed to comply with "pill pass" requirements. Prisoner No. 7 subsequently apologized for not going to pill pass and requested that his prescriptions be restarted. Dr. Edwards restarted and then discontinued several of Prisoner No. 7's medications over the following months.

127.   Without his medications, Prisoner No. 7 began engaging in self-harm, including swallowing paperclips in 2013. In response, Dr. Edwards noted "in the past he has been so destructive to himself at this facility that he has cost the taxpayers hundreds of thousands of dollars. It's my understanding that he actually has so much scar tissue that he cannot be operated again so at this point and time they're simply monitoring where the paperclips are in his GI track." Dr. Edwards concluded, "I don't believe that any of these medications he has ever been on have been helpful to him. . . . I do not think that any kind of medication is going to be of much benefit and the most benefit that he would get is a placebo effect. Obviously I am not able to stop him from doing mutilation stop [sic] mutilation such as he recently did in regards to swallowing paper clips."

128.   When Prisoner No. 7 went to the Deer Lodge Medical Center for abdominal pain from swallowing paper clips, the physician there prescribed both antidepressant and antipsychotic medications for Prisoner No. 7.

129.   In August 2013, Prisoner No. 7 was denied parole.  In the report to the parole board, his case manager stated, "I am unable to support a release at this time without an extensive mental health component and an updated positive psychological report."

### Prisoner No. 8

130.   Prisoner No. 8 was 23-years old when he was sent to the Prison in February 2013.  Prior to arriving at the Prison, he had spent two years at Yellowstone County Detention Facility ("YCDF"), where medical and mental health staff noted that he suffered from anxiety and depression and prescribed him antidepressants.

131.   In June 2011, Prisoner No. 8's mother died in a house fire.  A few days later, he attempted to commit suicide by slashing his neck twice with a razor at YCDF.  Medical reports indicated that he lost approximately one liter of blood as a result of his wounds.  During the months afterward, Prisoner No. 8 continued to tell medical staff that he suffered from growing depression and anxiety.

132.   Upon arriving at the Prison, Prisoner No. 8 informed medical and mental health staff of his suicide attempt, that he suffered from mental illness, that he believed he had bi-polar disorder and schizophrenia, and that he had been prescribed several medications for his mental illness.  Nevertheless, Prison mental health staff determined that he had "no significant" mental health needs.

42

133.   Prisoner No. 8 first met with Dr. Edwards in March 2013. In his meeting notes, Dr. Edwards dismissed the seriousness of Prisoner No. 8's suicide attempt. He wrote: "[Prisoner No. 8] reports that he attempted suicide in 2011 by cutting his throat when his mother dies [sic]. However, I actually couldn't even see a scar so it must not have been very serious."

134.   In May 2013, just three months after arriving at the Prison, Prisoner No. 8 was placed in solitary confinement for 90 days as a result of rule violations. In June 2013, Dr. Edwards met with Prisoner No. 8, but made no mention in his meeting notes of Prisoner No. 8 suffering from depression or other mental illnesses. However, Dr. Edwards wrote, "I am going to have one of the techs count his meds to make sure he has the right number within the next week or so."

135.   Prisoner No. 8 was released from solitary confinement on August 14, 2013. Nine days later corrections officers found him dead in his cell. Although no cause of death has been announced, medical staff who attempted to resuscitate Prisoner No. 8 were concerned that he had overdosed on drugs.

### The Prison Defendants Are Deliberately Indifferent To The Medical Needs Of Prisoners With Serious Mental Illness

136.   All of the defendants are well-aware that the Prison's treatment and care of prisoners with serious mental illness does not satisfy constitutional requirements. In its 2003 decision in *Walker v. State*, 68 P.3d 872 (Mont. 2003), the Montana Supreme Court made it very clear that the Prison has a constitutional

43

obligation to provide prisoners with appropriate mental health treatment and to eliminate disciplinary practices that exacerbate prisoners' mental illnesses. The Court concluded that the Prison's "behavior management plans" and living conditions constitute cruel and unusual punishment when they exacerbate the prisoner's mental health condition.

137.   In 2009, the DOC faced another lawsuit, *Katka v. State*, No. BDV 2009-1163 (1st Jud. Dist. Ct., Lewis and Clark Co.) challenging the Prison's treatment and discipline practices for juveniles with mental illness. The DOC resolved *Katka* by entering into a 2012 settlement agreement requiring the Prison to implement changes regarding its housing and treatment of prisoners with serious mental illness and treatment of suicidal prisoners. Throughout discovery in that case, Prison officials heard from mental health experts addressing the deficiencies in the Prison's use of solitary confinement and inadequate mental health treatment.

138.   The Prison Defendants know that numerous national standards prohibit the practices they are engaging in with respect to prisoners with mental illness.

139.   National Commission on Correctional Health Care Standards for Mental Health Services in Correctional Facilities, MH-E-07 states: "Inmates who are seriously mentally ill should not be confined under conditions of extreme

isolation." The Prison was accredited by the National Commission on Correctional Health Care in 2011.

140.   American Correctional Association Standards for Adult Correctional Institutions 4-4249 states: "Total isolation as punishment for a rule violation is not an acceptable practice."

141.   American Bar Association Treatment of Prisoner Standards, 23-6:11, states: "Prisoners diagnosed with serious mental illness should not be housed in settings that may exacerbate their mental illness or suicide risk, particularly in settings involving sensory deprivation or isolation."

142.   Society of Correctional Physicians' Position Statement on Restricted Housing of Mentally Ill Inmates states: [P]rolonged segregation of inmates with serious mental illness, with rare exceptions, violates basic tenets of mental health treatment. Inmates who are seriously mentally ill should be either excluded from prolonged segregation status (*i.e.*, beyond 4 weeks) or the conditions of their confinement should be modified in a manner that allows for adequate out-of-cell structured therapeutic activities and adequate time in an appropriately designed outdoor exercise area." Several other related standards exist in addition to those listed in this Complaint.

143.   In addition, Prisoners with serious mental illness regularly request and grieve the level of mental health care they are provided, including the negative

45

impact of isolation, mental health staff discontinuing their needed medications and mental health staff ignoring previous diagnoses. In 2012 alone, Ms. Buck publicly stated that mental health staff answered over 2,000 mental health requests. Several prisoners have appealed the inadequacy of the mental health treatment they receive to the Prison Warden and ultimately to the DOC Director.

144.   The Prison is regularly contacted by family members of prisoners with serious mental illness begging for their loved one to be put back on needed medications discontinued by Prison mental health staff. All of the Prison Defendants are aware of this.

145.   In addition, DRM has repeatedly informed the Prison officials of the serious deficiencies in the Prison's treatment of prisoners with serious mental illness.

146.   On February 26, 2014, DRM sent Director Batista and Director Opper a letter describing all of the facts alleged in this Complaint. To DRM's knowledge, to date, neither DOC nor DPHHS has made any modifications in their treatment of prisoners with serious mental illness.

## COUNT I
### Denial of Procedural Due Process in Violation of the Fifth and Fourteenth Amendments to the United States Constitution

147.   DRM incorporates the allegations of paragraphs 1-146 as if fully restated here.

148.    Individuals who have been found by a court to be Guilty But Mentally Ill and committed to the custody of DPHHS possess a liberty interest to be free from arbitrary transfers out of the State Hospital and into other facilities, when the result of such transfers will be detrimental to the GBMI individual's custody, care, and treatment needs.

149.    The GBMI individual's liberty interest arises through statutory and constitutional law.  For example, § 46-14-312, MCA  requires the Director of DPHSS to transfer individuals sentenced GBMI to the Prison only if the Prison "will better serve the [patient's] custody, care and treatment needs," and only after due consideration of the recommendations of the professionals providing treatment to the defendant and recommendations of the professionals who have evaluated the defendant.  Section 53-21-142(B), MCA, further guarantees that individuals who are committed to the State Hospital will have "the least restrictive conditions necessary to achieve the purpose of commitment;" conditions can "restrict the patient's liberty only to the extent necessary and consistent with the patient's treatment need, applicable requirements of law, and judicial orders."  The Eighth Amendment to the U.S. Constitution protects GBMI individuals from cruel and unusual punishment, including the intentional deprivation of necessary mental health treatment.

150.    As described above, GBMI individuals are arbitrarily transferred out of the State Hospital, in violation of law, and without proper notice and a fair opportunity to challenge the transfer decision.  These arbitrary transfers inevitably result in the intentional, cruel and unusual deprivation of necessary mental health treatment to GBMI individuals, under more restrictive conditions.

151.    By arbitrarily transferring individuals sentenced Guilty But Mentally Ill to the Prison without due consideration of individuals' custody, care and treatment needs, and without fair notice and an opportunity to be heard, defendants Opper and Redfern deprive those individuals of procedural due process in violation of the Fourteenth Amendment to the United States Constitution.

### COUNT II
### Cruel and Usual Punishment in Violation of the
### Eighth Amendment to the U.S. Constitution

152.    DRM incorporates the allegations of paragraphs 1-151 as if fully restated here.

153.    By their policies, practices, and acts, the Prison Defendants violate the right of prisoners with serious mental illness to be free from cruel and unusual punishment as guaranteed by the Eighth Amendment to the U.S. Constitution, enforceable through 42 U.S.C. § 1983.

48

154.   As a matter of policy and practice, the Prison Defendants impose periods of solitary confinement and other forms of punishment upon prisoners with serious mental illness that lead to the deterioration of their mental health.

155.   As a matter of policy and practice, the Prison Defendants fail to provide adequate medical care to prisoners with serious mental illness, which leads to the deterioration of the prisoners' mental health.

156.   The Prison Defendants have long been aware of deleterious consequences of these conditions of confinement that they impose on prisoners with serious mental illness, but have failed to take reasonable corrective action.

157.   By imposing these conditions of confinement while being aware of the resulting deleterious effects, the Prison Defendants are acting with deliberate indifference to the serious medical needs of, and the substantial risk of harm to, prisoners with serious mental illness.

## COUNT III
### Violation of the Americans With Disabilities Act

158.   DRM incorporates the allegations of paragraphs 1-157 as if fully restated here.

159.   DRM's constituents are qualified individuals with disabilities as defined in the Americans with Disabilities Act ("ADA").  They have mental impairments that substantially limit one or more major life activity, including but not limited to thinking, concentrating, interacting with others, and controlling their

behavior. As state prisoners, all of DRM's constituents meet the essential eligibility requirements for receipt of services or the participation in programs or activities provided by the DOC.

160.   The DOC is a public entity as defined under Title II of the ADA, 42 U.S.C. § 12131(1)(B).

161.   The Prison Defendants knowingly and consistently discriminates against mentally disabled prisoners by failing to provide them with reasonable accommodation for their disabilities and punishing them for behavior that is a product of their disability.

162.   By placing prisoners with serious mental illness in solitary confinement, the Prison Defendants have denied prisoners with serious mental illness the benefits of the facility's services, programs and activities, including education, programming, recreation, exercise, and mental health treatment and services, thus discriminating against DRM's constituents on the basis of their disability in violation of 42 U.S.C. § 12132. Discrimination against prisoners with serious mental illness occurs particularly because such prisoners cannot receive metal health services sufficient to counteract the effects solitary confinement, behavior management plans, and other forms of punishment have on mentally ill prisoners which is distinct from the impact it has on prisoners who are not mentally ill.

163.   The Prison Defendants discriminate against prisoners with serious mental illness on the basis of their disabilities.  The Prison Defendants routinely warehouse prisoners with serious mental illness in solitary confinement.  Plaintiff believes discovery will show that the State Prison Defendants disproportionally place prisoners with serious mental illness in solitary confinement.

164.   By placing prisoners with serious mental illness in solitary confinement and imposing behavior management plans and other forms of punishment, the Prison Defendants (a) have failed to furnish reasonable accommodation to prisoners with disabilities; (b) punish prisoners with serious mental illnesses for disability-related conduct; and (c) deprive prisoners with mental illnesses of access to adequate mental health service.

## COUNT IV
### Violation of Section 504 of the Rehabilitation Act of 1973

165.   DRM incorporates the allegations of paragraphs 1-164 as if fully restated here.

166.   DRM's constituents are qualified individuals with disabilities as defined in Section 504 of the Rehabilitation Act of 1973.  They have mental impairments that substantially limit one or more major life activity, including but not limited to thinking, concentrating, interacting with others, and controlling their behavior; they have records of having such an impairment; or they are regarded as having such an impairment.  As state prisoners, all of DRM's constituents meet the

essential eligibility requirements for receipt of services or the participation in programs or activities provided by the DOC.

167.   The DOC administers a program or activity that receives federal financial assistance.

168.   The Prison Defendants discriminate against mentally disabled prisoners by failing to provide reasonable accommodation for their disabilities.

169.   The Prison Defendants discriminate against mentally disabled prisoners solely on the basis of their disabilities in violation of Section 504.

170.   In placing prisoners with serious mental illness in solitary confinement, the DOC Defendants have denied prisoners with mental illness the benefits of the facility's services, programs and activities, including education, programming, recreation, exercise and mental health services, thus discriminating against DRM's constituents on the basis of their disability in violation of 29 U.S.C. § 794.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff Disability Rights Montana, Inc. prays for an order and judgment in which this Court:

A.   Exercises continuing jurisdiction over this action;

B.   Issues declaratory judgment that the DPHHS Defendants' acts violate the prisoners' rights to due process protected by the U.S. Constitution and that

these acts and omissions continue to cause an ongoing risk of the violation of those rights;

C.     Issues declaratory judgment that the Prison Defendants' acts violate the Eighth Amendment to the U.S. Constitution, and that these acts and omissions continue to cause an ongoing risk of the violation of those rights;

D.     Issues declaratory judgment that the Prison Defendants' acts constitute discrimination in violation of the Rehabilitation Act, 29 U.S.C. §794, and the Americans with Disabilities Act of 1990, 42 U.S.C. §12132;

E.     Issues injunctive relief to stop the constitutional and statutory violations described above, including injunctive relief that does the following:

1.     Requires the DPHHS Defendants to take immediate steps that ensure that individuals sentenced Guilty But Mentally Ill to the Department of Public Health and Human Services receive adequate due process prior to transfer to the Montana State Prison;

2.     Requires the Prison Defendants to take immediate steps to ensure that individuals with serious mental illness incarcerated at the Montana State Prison receive constitutionally adequate mental health care;

3.     Enjoins the Prison Defendants from placing prisoners with serious mental illness in solitary confinement;

F.     Retains jurisdiction of this case until Defendants have fully complied with the orders of this Court, and there is a reasonable assurance that Defendants will continue to comply in the future absent continuing jurisdiction;

G.     Awards reasonable attorneys' fees, litigation expenses, and costs pursuant to 42 U.S.C. 1988, 42 U.S.C. §12205 and/or 42 U.S.C. §794a

H.     Orders all other relief the Court deems appropriate.


Dated: March 28, 2014

/s/  Kyle A. Gray
HOLLAND & HART LLP

*Attorneys for Plaintiff*
*Disability Rights Montana, Inc.*
