James Park Taylor
Jon E. Ellingson
ACLU of Montana
241 E. Alder
P.O. Box 9138
Missoula, MT  59807
Telephone:  (406) 549-6159
Email:  jpt42@hotmail.com
          jone@aclumontana.org

Kyle A. Gray
Adrian A. Miller
Holland & Hart LLP
401 N. 31st Street
Suite 1500
Billings, MT 59101-1277
Telephone:  (406) 252-2166
Email:  kgray@hollandandhart.com
          aamiller@hollandhart.com

Jeffrey A. Simmons
Foley & Lardner LLP
150 East Gilman Street
Madison, WI  53703-1482
Telephone:  (608) 258-4267
Email:  jsimmons@foley.com

Anna Conley
Attorney At Law
P.O. Box 9101
Missoula, MT  59807
Telephone:  (406) 830-0367
Email:  anna@annaconley.com

*Attorneys for Plaintiff Disability Rights Montana, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BUTTE DIVISION

| | |
|---|---|
| DISABILITY RIGHTS MONTANA, INC., on behalf of all prisoners with serious mental illness confined to the Montana State Prison,<br><br>        Plaintiff,<br><br>vs.<br><br>MIKE BATISTA, in his official capacity as Director of the Montana Department of Corrections; LEROY KIRKEGARD, in his official capacity as warden of Montana State Prison,<br><br>        Defendants. | Civil No. CV-14-25-BU-SEH<br><br>**SECOND AMENDED COMPLAINT AGAINST DEFENDANTS MIKE BATISTA AND LEROY KIRKEGARD** |

4840-0163-3315.1

For its Second Amended Complaint in this action, plaintiff Disability Rights Montana, Inc. ("DRM") alleges as follows:

1.      This is an action brought on behalf of all prisoners with serious mental illness who are confined to the Montana State Prison ("State Prison" or "Prison"). DRM brings claims on behalf of these prisoners pursuant to 42 U.S.C. § 1983 for ongoing violations of their constitutional right to be free from cruel and unusual punishment under the Eighth Amendment to the United States Constitution.

### THE PARTIES

2.      Plaintiff DRM is a not-for-profit Montana corporation and the authorized protection and advocacy agency for Montana pursuant to the federal Protection and Advocacy for Individuals with Mental Illness Act, 42 U.S.C. § 10801 et seq.  Among other things, DRM is authorized by federal law to pursue legal remedies to ensure that individuals with serious mental illness in state institutions are protected from abuse and neglect.  Because prisoners with serious mental illness are DRM's constituents, DRM has associational standing to bring claims on behalf of prisoners with serious mental illness as alleged in this lawsuit.

3.      Individuals who have received or are receiving mental health services, or their family members, are substantially involved in DRM's governance, including serving on DRM's board of directors.  DRM's board of directors is comprised of ten members, two of whom either have received or are receiving

mental health services, and three of whom have family members who have received or are receiving mental health services.  DRM's advisory council has eight members, seven of whom either have received or are receiving mental health services and one of whom has a family member who has received or is receiving mental health services.

4.     Defendant Mike Batista is Director of the Montana Department of Corrections ("DOC") and is sued in his official capacity.  At all times relevant to this Second Amended Complaint, Director Batista was acting within the scope of his employment and under color of state law in his capacity as Director of DOC. Director Batista is directly responsible for the administration of the Prison and has authority to direct the housing, discipline, treatment and care of prisoners with serious mental illness at the Prison.  In his official capacity, Director Batista is responsible for administering the policies and practices at issue with respect to the claims against him and has the authority to implement the relief sought in this action.

5.     Defendant Leroy Kirkegard is Warden of the State Prison and is sued in his official capacity.  At all times relevant to this Second Amended Complaint Warden Kirkegard was acting within the scope of his employment and under color of state law in his capacity as Warden.  Warden Kirkegard is directly responsible for the administration of the Prison and has authority to direct the housing,

discipline, treatment and care of prisoners with serious mental illness at the Prison. In his official capacity, Warden Kirkegard is responsible for administering the policies and practices at issue with respect to the claims against him and has the authority to implement the relief sought in this action.

6.     Director Batista and Warden Kirkegard are referred to collectively as the "DOC Defendants."

## JURISDICTION AND VENUE

7.     This court has jurisdiction over DRM's claims pursuant to 28 U.S.C. §§ 1331 and 1343.

8.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), and is proper in this Division pursuant to Local Rule 3.2(b), *inter alia*, because the unlawful transfers from the State Hospital that are at issue in DRM's claims against Richard Opper and John Glueckert, which were part of this action as originally filed, occurred in Deer Lodge County.

9.     This Court has authority pursuant to 42 U.S.C. § 1983 to order injunctive and declaratory relief.

## COUNT I

### Cruel and Usual Punishment in Violation of the Eighth Amendment to the U.S. Constitution

10.    DRM incorporates the allegations of paragraphs 1 - 9 as if fully restated here.

11.     DRM alleges that the DOC Defendants have subjected, and are continuing to subject, prisoners with serious mental illness to cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution.

12.     The DOC defines a "serious mental illness" as "a clinical disorder of thought, mood or anxiety included under Axis I of the DSM; e.g., schizophrenia, major depression, bi-polar disorder, PTSD, or panic disorder and inmates who were previously diagnosed with such mental illness unless there is certification in the record that the diagnosis has been changed or altered as a result of a subsequent mental health evaluation by a licensed mental health professional.  It does not include personality disorders; i.e., borderline, antisocial, or paranoid personality disorders."  The DOC uses this definition for purposes of administering behavior management plans that it imposes as punishment for prisoners.

13.     The DOC does not have a consistent method for categorizing prisoners with mental illness.  For example, the State Prison's Operational Procedure MSP 3.5.3 regarding Mental Health Cases in Locked Housing Status, addresses only "Severe Mental Health Problems," which it defines broadly as "any organic, mental or emotional impairment, which has a substantial adverse effect on an inmate's cognitive or volitional function."

14.   A more appropriate definition of "serious mental illness," that is accepted by mental health professionals and would better identify those prisoners who are adversely affected by the actions of the DOC Defendants alleged here, is as follows:

A.   A current diagnosis or significant history of any of the following types of DSM-5 diagnoses, even if there are no current symptoms:

1.   Schizophrenia

2.   Delusional Disorder

3.   Schizophreniform Disorder

4.   Schizoaffective Disorder

5.   Brief Psychotic Disorder

6.   Substance/Medication-Induced Psychotic Disorder

7.   Major Depressive Disorders

8.   Bi-polar Disorder

B.   Other DSM-5 Disorders that are commonly characterized by breaks with reality, or perceptions of reality, that lead the individual to experience significant functional impairment involving acts of self-harm or other behaviors that have a seriously adverse effect on life or on mental or physical health.

    C.    A current diagnosis or history of an intellectual disability (including mental retardation), a dementia, traumatic brain injury or other cognitive disorder that results in a significant functional impairment involving acts of self-harm or other behaviors that have a seriously adverse effect on life or on mental or physical health.

    D.    A current diagnosis or history of a severe personality disorder that is manifested by episodes of psychosis or depression, and results in significant functional impairment involving acts of self-harm or other behaviors that have a seriously adverse effect on life or on mental or physical health.

15.    Regardless, under any legitimate definition of "serious mental illness" the DOC Defendants are subjecting prisoners with serious mental illness to cruel and unusual punishment by engaging in at least the following practices:

    a.    placing prisoners with serious mental illness in various forms of solitary confinement for 22 to 24 hours per day for months and years at a time;

    b.    placing prisoners with serious mental illness on behavior management plans that involve solitary confinement and extreme restrictions of privileges;

c.    having no standards for determining whether placing a prisoner with serious mental illness in solitary confinement or on a behavior management plan will be harmful to the prisoner's mental health;

d.    engaging in a pattern of refusing to properly diagnose prisoners as suffering from serious mental illness;

e.    engaging in a pattern of refusing to provide prisoners with medications for serious mental illness;

f.    failing to have a system in place to review and evaluate the diagnosing and prescribing practices of its mental health staff;

g.    failing to have a system to classify prisoners according to their mental health needs;

h.    failing to adequately consider prisoners' serious mental illnesses when making decisions about prisoners' housing and custody levels; and

i.    having no system in place for auditing, evaluating or ensuring the effectiveness of its mental health care program in treating prisoners with serious mental illness.

16.    In 2011, the Prison Warden estimated that approximately one-fifth the Prison's approximately 1,500 prisoners suffer from mental illness.  The Prison's

staff psychiatrist has approximately 275 prisoners on his or her medication

management caseload.

17.     It is well known in the correctional community and in the mental

health treatment community that subjecting prisoners to extended periods of

solitary confinement is detrimental to their mental health.

18.     For example, National Commission on Correctional Health Care

Standards for Mental Health Services in Correctional Facilities, MH-E-07, states:

"Inmates who are seriously mentally ill should not be confined under conditions of

extreme isolation."

19.     Society of Correctional Physicians' Position Statement on Restricted

Housing of Mentally Ill Inmates states:  "[P]rolonged segregation of inmates with

serious mental illness, with rare exceptions, violates basic tenets of mental health

treatment.  Inmates who are seriously mentally ill should be either excluded from

prolonged segregation status (*i.e.*, beyond 4 weeks) or the conditions of their

confinement should be modified in a manner that allows for adequate out-of-cell

structured therapeutic activities and adequate time in an appropriately designed

outdoor exercise area."

20.     In March 2015, United States Supreme Court Justice Anthony

Kennedy, in testimony before the House Appropriation Subcommittee on Financial

Services and General Government, said "Solitary confinement literally drives men mad."

21.     The DOC Defendants are aware of the fact that solitary confinement is detrimental to the health of prisoners with serious mental illness.  In particular, the DOC Defendants are aware of the National Commission on Correctional Health Care Standards for Mental Health Services in Correctional Facilities, because the DOC Defendants have sought certification from that organization.

22.     The State Prison uses at least four general forms of solitary confinement to punish prisoners with mental illness:  administrative segregation, restricted administrative segregation, disciplinary detention, and behavior modification plans.  All of the forms of solitary confinement involve subjecting the prisoner to being locked in his cell alone for 22 to 24 hours a day, seven days a week.  The DOC Defendants refer to these forms of solitary confinement as "Locked Housing."

23.     In the least restrictive form of administrative segregation, prisoners are isolated in their cells at least 22 hours a day, five days a week, and 24 hours a day, two days a week.  The out-of-cell time for prisoners in the least restrictive forms of administrative segregation consists of one hour per day alone in a dayroom adjoining his cell, and one hour per day in a small outdoor caged area by himself.  If there is inclement weather, the one hour of outdoor recreation may be

cancelled.  If a prisoner is not feeling well or does not wake up during the designated one-hour outdoor recreation period, which is often the case for prisoners with serious mental illness, the prisoner may not receive his one hour of outdoor time.

24.     Prisoners with serious mental illness who are placed in solitary confinement receive no therapy for their mental illness.  The primary contact with mental health staff while they are in solitary confinement consists of weekly rounds by mental health technicians.  Each visit during weekly rounds typically lasts no more than a few minutes and is conducted at the prisoner's cell door, where other prisoners and corrections officers can hear what is said.  As a result, prisoners with serious mental illness are often reluctant to share their mental health concerns during those rounds.  The futility of this process causes prisoners with serious mental illness to suffer additional stress.

25.     In more restrictive forms of administrative segregation and in restricted administrative segregation, prisoners are locked in their cells at least 23 hours per day, five days a week, and 24 hours a day, two days a week.  Prisoners in these forms of solitary confinement receive one hour of outdoor recreation time five days a week.  Again, if the prisoner is not feeling well or asleep, or if there is inclement weather, the prison may not receive the one hour of outdoor recreation time.

26.     Disciplinary detention is among the most extreme forms of solitary confinement imposed at the Prison.  Disciplinary detention is referred to by prisoners and Prison staff as "The Hole."  The Hole is total isolation.  Prisoners sent to The Hole are subjected to 24-hour isolation in their cell.  Some cells used for The Hole have blacked-out windows, resulting in a total absence of natural light.  Prisoners placed in The Hole cannot make phone calls or have visitors. They cannot participate in religious services or rehabilitative treatment programs. They receive no mental health therapy.  They receive no indoor or outdoor recreation time whatsoever.  The only out-of-cell time given to prisoners in The Hole consists of three, ten-minute showers per week.

27.     Behavior management plans ("BMPs") are a form of punishment that involves a combination of solitary confinement and extreme reduction in privileges.  Under a BMP, a prisoner is kept in 24-hour isolation.  A prisoner on a BMP starts out by having all of his prison clothing removed and being given just a mattress, blanket, and a suicide smock.  At the start of a BMP all meals consist of a tasteless loaf of food ("nutraloaf") delivered on a paper towel, and the prisoner is not allowed any running water in his cell.  A guard must flush the toilet for the prisoner, and the prisoner must ask for water to wash his hands.  In extreme forms of BMPs, prisoners must go to the bathroom through a grate on the floor.

28.     Staff at the Prison has placed individual prisoners with serious mental illness on BMPs numerous times, without modifying the BMP to account for the prisoner's mental illness or the failure of previous BMPs to alter the prisoner's behavior.

29.     Although the Prison's formal policies call for Prison mental health staff to certify that "[t]he inmate's present behavior is not the direct result of an Axis I serious mental disorder" before placing a prisoner on a BMP, the DOC and the Prison have no standards to guide mental health staff in making that determination and do not require mental health staff to document the factual bases for their decisions.  Under the Prison's policies, Prison mental health staff certify prisoners in advance to be subjected to BMPs at any time during the following six months.

30.     Rather than protect prisoners with serious mental illness from the damaging effects of BMPs, mental health staff sometimes encourage the use of BMPs for such prisoners.  In one instance, a Prison mental health staff person wrote to prison staff that two individuals sentenced Guilty But Mentally Ill would be "good candidates" for BMPs at the Prison.

31.     The Prison regularly places prisoners with serious mental illness in all of the forms of solitary confinement described above for weeks and months at a

time.  Some prisoners with serious mental illness have spent years in various forms

of solitary confinement during their time at the Prison.

32.     Prisoners with serious mental illness at the Prison receive little, if any,

meaningful interaction with mental health clinicians.  The Prison offers group

therapy with mental health staff to only a very small percentage of the prisoners

with serious mental illness, none of whom are in solitary confinement.  An even

smaller percentage of prisoners with serious mental illness receive individual

therapy at the Prison.

33.     For the vast majority of prisoners with serious mental illness, their

interaction with mental health staff at the Prison consists of non-confidential

weekly cell checks by mental health technicians at the cell door.  Prisoners' written

requests for additional mental health care are regularly denied.  The futility of

requesting additional mental health care exacerbates prisoners' mental illnesses.

34.     The DOC Defendants fail to respond appropriately to threats of

suicide by prisoners with serious mental illness.  The Prison's most common

response to a prisoner expressing thoughts of suicide is to place a prisoner on a

BMP.  This response causes prisoners to be reluctant to admit to thoughts of

suicide and, as a result, increases the risk of suicide.

**Representative Examples of Prisoners With Serious Mental Illness Who Have Experienced Cruel and Unusual Punishment**

35.     Below are examples of the experiences of nine prisoners who suffered from serious mental illness and were subjected to solitary confinement and improper mental health care at the State Prison.  The examples demonstrate an ongoing pattern of behavior at the Prison that indicates that numerous prisoners with serious mental illness – not just the nine identified below – have been subjected to cruel and unusual punishment and that all prisoners with serious mental illness at the Prison are at significant risk for suffering cruel and unusual punishment in the future.

**James Larson**

36.     James Larson was sentenced Guilty But Mentally Ill ("GBMI") in 2006.  Among the reasons the Judge gave for the sentence was that "[t]he Defendant has substance and mental health issues and [the Montana State Hospital] is the best facility to address those conditions."  The Montana Department of Public Health and Social Services placed Mr. Larson at the State Hospital, where he was diagnosed as schizophrenic and put on antipsychotic medications.

37.     Mr. Larson arrived at the Prison in 2008.  From 2008 to 2012, Prison mental health staff repeatedly acknowledged his diagnosis of schizophrenia and he was prescribed multiple antipsychotic medications.  Despite that diagnosis, Prison staff repeatedly placed Mr. Larson in solitary confinement and subjected him to

BMPs for threatening self-harm.  Mr. Larson told Prison mental health staff that he

wanted to cry when he was in solitary confinement and that he did not "do hole

time well."  He said that in solitary confinement "all I do is suffer unmitigated hell

in these cells all the time."

38.     Despite his GBMI sentence and his previous diagnoses of suffering

from serious mental illness, in 2012 Prison mental health staff decided that Mr.

Larson was faking his mental illness and decided to taper off his antipsychotic

medications.

39.     Mr. Larson is currently confined to the Prison's Locked Housing unit.

40.     The DOC Defendants are aware of the cruel and unusual punishment

Mr. Larson has been subjected to because he exhausted his administrative remedies

regarding inadequate mental health care at the Prison through an appeal to the

DOC Director.

**James Patrick**

41.     In 2002, a district court judge found James Patrick Guilty But

Mentally Ill.  In 2007, DPHHS transferred Mr. Patrick to the State Prison.  Since

arriving at the Prison, Mr. Patrick has spent over three years in solitary

confinement for "bizarre" and "disruptive" behavior.  For two months, Mr. Patrick

was placed in the Prison's Mental Health Treatment Unit ("MHTU") where,

despite his previous diagnoses of serious mental illness, Prison mental health staff

concluded that his problems were behavioral and stemmed from immaturity and other unknown sources.  As a result, Prison staff transferred Mr. Patrick back to solitary confinement.

42.    Prison staff have continuously refused to consider Mr. Patrick's mental illness when addressing his behavior.  Prison staff have placed Mr. Patrick on BMPs approximately 25 times for acts including actual and threatened self-harm, smearing feces in his cell, banging his head until it bled on his cell door while asking for real food instead of nutraloaf, crying and saying people on the floor were talking to him, attempting suicide, cutting himself with a broken deodorant stick, and hitting his cell door and screaming "help me help me" for 20 minutes.  Mr. Patrick has spent weeks in 24-hour isolation in disciplinary detention for similar behaviors.

43.    In 2012, Prison mental health staff discontinued Mr. Patrick's antipsychotic medications, which he had taken for many years, after he temporarily refused to take them.  Mr. Patrick's subsequent requests for medications were denied.  While unmedicated, Mr. Patrick was found guilty of multiple rule violations for bizarre behavior and self-harm and was subjected to BMPs, disciplinary detention and administrative segregation.

**Shaun Morrison**

44.     Shaun Morrison has received diagnoses of serious mental illness throughout his life, including major depressive disorder.  He also has a long history of extreme self-harm.  He has cut himself on numerous occasions, resulting in hospitalizations and near loss of life due to blood loss.  In addition to cutting himself, he has also bitten through his own skin, ripped stitches, and reopened wounds with foreign objects.

45.     In 2006, Mr. Morrison was sentenced Guilty But Mentally Ill.  That same year, DPHHS transferred him to the State Prison.

46.      While at the Prison, Mr. Morrison spent two months at the MHTU.  During that time, he filled out a "treatment planning worksheet," in which he listed the following ways Prison mental health staff could help him:  "Be there to talk to me when I'm having problems.  Groups with homework.  Give me stuff to do so I can keep myself and my mind busy."

47.     Instead, Prison staff transferred him to solitary confinement because the MHTU could not manage his self-harm behavior.  Despite his GBMI sentence and previous diagnoses of mental illness, Prison staff said that Mr. Morrison had "no mental health history that would preclude an ad seg placement."

48.     At one point, Prison mental health staff discontinued Mr. Morrison's medications, based on the staff's conclusion that "he appears to do as well/poorly, whether on or off Rx."

49.     The Prison's most common response to Mr. Morrison's acts of self-harm has been to place him on a BMP.  He has spent significant periods of time on BMPs in 24-hour isolation, often in a padded cell.  The longer he spent in solitary confinement and on BMPs, the worse his self-harm episodes became.

50.     In July 2011, Mr. Morrison stated to Prison mental health staff that he had "been in locked housing for way too long" and was "wound up," "stressed," and worried about doing "something stupid" that would get him into trouble.

51.     Upon being moved out of solitary confinement, in August 2011, Mr. Morrison murdered another prisoner.  Mr. Morrison was found guilty of homicide and sentenced to the DOC for life without the possibility of parole.

**<u>Cory Weis</u>**

52.     Cory Weis was diagnosed with bipolar disorder and schizophrenia and received various medications for those illnesses before arriving at the Prison. When the Judge sentenced him to the Prison, she recognized Mr. Weis's mental health issues and "highly recommend[ed] that he be considered for placement in the mental health block at the Prison because that seems to me that that's going to be the best place for [him]."

53.     Despite the Judge's express recommendation, Mr. Weis was never placed in the MHTU at the Prison.  Prison records suggest that Mr. Weis spent more than half of his time at the Prison in solitary confinement.  The Prison's mental health staff stated that Mr. Weis had "no known history of psychiatric problems or symptoms that would preclude Administrative Segregation for inappropriate behavior."

54.     Within weeks of arriving at the Prison, Mr. Weis told staff that he was hearing voices telling him to do things to himself and he threatened to kill himself.  Shortly thereafter, Mr. Weis was disciplined for smearing feces on himself, but a Prison therapist concluded that the conduct was not the result of a serious mental illness.  A little more than a month later, Mr. Weis was disciplined for banging his head against the wall and spreading feces on himself.  In response, Prison mental health staff authorized placing Mr. Weis in solitary confinement and authorized the use of a BMP.  During his seven months at the Prison, Mr. Weis met with the Prison psychiatrist just once, more than four months after his arrival.

55.     Seven months after arriving at the Prison, Mr. Weis was found dead in his cell as a result of hanging.

**Marty Hayworth**

56.     Marty Hayworth was diagnosed with multiple serious mental illnesses before arriving at the Prison, including schizophrenia.  Mr. Hayworth hears the

voice of a dog named Gene who directs him to harm himself.  Mr. Hayworth has repeatedly attempted to take out his own eyes.

57.     Despite his previous diagnoses of serious mental illness, Prison staff have refused to acknowledge that Mr. Hayworth is mentally ill.   Prison mental health staff has described Mr. Hayworth's attempts to take his own eyes out and swallow objects as "manipulative" and "characterological," rather than symptoms of mental illness.

58.     In 2012, the Prison psychiatrist diagnosed Mr. Hayworth as malingering (*i.e.* faking) mental illness.  The psychiatrist also discontinued all of Mr. Hayworth's medications without meeting with him or investigating possible reasons for noncompliance.  Mr. Hayworth's stated reason for refusing to take his medications was "the outerspace people and Gods and I don't need any mental health medication."  Subsequently, Mr. Hayworth received approximately 40 disciplinary violations, which Prison custody staff attributed to "medication noncompliance."

59.     Prison mental health staff has repeatedly approved standard disciplinary measures for Mr. Hayworth's behavior for many years.  Since 2005, Mr. Hayworth has spent years in solitary confinement at the Prison.  He reports feeling like a "young kid locked up in a closet" when he is in solitary.  He spreads feces in his cell to "keep bad spirits away," and engages in self-harm.  He has been

repeatedly disciplined and restrained for self-harm and behavior such as smearing feces, drinking Ajax, and swallowing glass.

60.    In April 2015, Mr. Hayworth contacted DRM to tell them that he believed Prison staff were constructing a cross on which to crucify him.

**Paul Parker**

61.    Paul Parker has long-standing diagnoses of mental illness, including bi-polar disorder, post-traumatic stress disorder, and major depression.  For many years, Mr. Parker has taken lithium for his bi-polar disorder, as well as antidepressants and antipsychotic medications.

62.    Prison staff have repeatedly ignored Mr. Parker's mental illnesses when addressing his behavior and making his housing assignments.  Mr. Parker has spent more than eight years in solitary confinement.  In solitary confinement, Prison mental health staff has observed Mr. Parker decompensating.  After years in solitary confinement, Mr. Parker has expressed concern regarding his ability to reintegrate into the general prison population.

63.    Prison staff have repeatedly placed Mr. Parker in 24-hour isolation on BMPs for threatening to slice his throat, threatening to stab himself with pens, biting his arm and wrist and smearing the blood on the floor "to make the situation look worse than it actually was," smearing blood on his cell, and writing a message in blood about wanting to die.

64.     Prison mental health staff refuse to acknowledge the existence of Mr. Parker's mental illness.  In 2012, mental health staff concluded that Mr. Parker was biting and picking at his arm "for the purpose of manipulating staff and receiving mental health services at his leisure."  They also concluded that his act of smearing blood on walls was "malingering his depression to gain attention."

65.     Prison staff have been deliberately indifferent to the harmful effect of solitary confinement on Mr. Parker.  In a 2011 document, Prison staff wrote that they were placing Mr. Parker in solitary confinement with the goals of:  "learn to deal with depression," "learn to refrain from this type of behavior by working on his 'people skills' and thinking before he reacts," and finding ways to "occupy his mind."

66.     After Mr. Parker met with the Prison psychiatrist, the psychiatrist wrote:  "I think most of his complaints were involving being in locked housing but I explained to him that there wasn't anything I could do about that."

67.     In 2012, the Prison psychiatrist concluded that Mr. Parker did not have bi-polar disorder, despite previous diagnoses of that illness.  The psychiatrist then discontinued Mr. Parker's lithium prescription and refused to restart it.

**Walter Taylor**

68.     Walter Taylor is 70 years old and has received several mental illness diagnoses during his life, including schizophrenia, bi-polar disorder, major depression and personality disorders.

69.     Mr. Taylor's mental illness manifests itself in, among other things, numerous acts of extreme self-mutilation.  Over many years, Mr. Taylor has swallowed safety pins, razor blades, paper clips, needles, spoons, nails, and tacks. He has also inserted objects into his penis, including paper clips, foil and copper wires.  Mr. Taylor has had over 30 stomach surgeries for swallowing foreign objects.

70.     Prison staff views Mr. Taylor's acts of self-harm as "manipulative" and "not the result of serious mental illness."  Prison staff have housed Mr. Taylor in solitary confinement for several years, and have placed him on BMPs numerous times in response to his acts of self-harm.

71.     From approximately 2005 to 2012, Mr. Taylor was prescribed a combination of medications that worked well for him, including Prozac, Lithium, Seroquel and Propranolol.  During this time he engaged in few self-harm behaviors and worked as a janitor in the prison.

72.     In approximately 2012, however, the Prison psychiatrist decided that Mr. Taylor was not suffering from a serious mental illness and discontinued all of Mr. Taylor's medications.

73.     Without his medications, Mr. Taylor began engaging in self-harm, including swallowing paperclips in 2013.

74.     In August 2013, Mr. Taylor was denied parole.  In the report to the parole board, his case manager stated, "I am unable to support a release at this time without an extensive mental health component and an updated positive psychological report."

**Cleveland Boyer**

75.     Cleveland Boyer was 23-years old when he was sent to the Prison in February 2013.  Prior to arriving at the Prison, he had spent two years at Yellowstone County Detention Facility ("YCDF"), where medical and mental health staff noted that he suffered from anxiety and depression and prescribed him antidepressants.

76.     In June 2011, Mr. Boyer's mother died in a house fire.  A few days later, he attempted to commit suicide by slashing his neck twice with a razor at YCDF.

77.     Upon arriving at the Prison, Mr. Boyer informed medical and mental health staff of his suicide attempt, that he suffered from mental illness, that he

believed he had bi-polar disorder and schizophrenia, and that he had been prescribed several medications for his mental illness.  Nevertheless, Prison mental health staff determined that he had "no significant" mental health needs.

78.     The Prison psychiatrist dismissed the seriousness of Mr. Boyer's suicide attempt, writing:  "Boyer reports that he attempted suicide in 2011 by cutting his throat when his mother dies [sic].  However, I actually couldn't even see a scar so it must not have been very serious."

79.     Two months after seeing the psychiatrist and just three months after arriving at the Prison, Prison staff placed Mr. Boyer in solitary confinement for 90 days as a result of rule violations.  Mr. Boyer was released from solitary confinement on August 14, 2013.  Nine days later corrections officers found him dead in his cell.  Although no cause of death has been announced, medical staff who attempted to resuscitate Mr. Boyer were concerned that he had overdosed on drugs.

**Matthew Brandemihl**

80.     Matthew Brandemihl was 32 years old when he was sent to the Prison from Gallatin County jail on or about May 12, 2014.  Approximately one week before he was scheduled for transfer to the Prison, Mr. Brandemihl attempted suicide in his cell by biting a hole in his wrist approximately two inches in diameter.  Questioned by a police officer at the hospital later that day, Mr.

Brandemihl stated that he believed he was the son of God and has been alive for one thousand years, and that his brother was the devil and becomes a spirit and possesses other people's bodies in order to torment him, and tells him to commit acts of destruction.

81.     Mr. Brandemihl started taking the antidepressant Citalopram to treat an apparent anxiety disorder approximately three days before this suicide attempt.

82.     According to Prison records, during his clinical intake at the Prison, Mr. Brandemihl complained that "a device has been drilled into, or implanted into my head" and appeared "sad" and "depressed."  The nurse who evaluated him, however, did not recommend a psychiatric evaluation or treatment, psychological testing, or placement in a mental health group.

83.     On June 20, 2014, Mr. Brandemihl became agitated during a trip to the infirmary and refused to leave when asked.  When confronted by corrections officers, Mr. Brandemihl declared that his name was "Jesus" and accused Prison staff of trying to poison his food and water.   The prison investigator recommended discipline for Mr. Brandemihl instead of mental health treatment, concluding that his behavior was "not symptomatic of a mental illness that would prevent knowledge of his actions."  Mr. Brandemihl was sentenced to 11 days in Locked Housing.

84.     In 2014, the Prison psychiatrist concluded that Mr. Brandemihl's behavior and psychotic beliefs were evidence of "just frank malingering and being uncooperative" and the side effects of past substance abuse.  He made no recommendations for mental health treatment or medication for Mr. Brandemihl.

85.     In July 2014, Mr. Brandemihl attempted suicide again by trying to chew through his arm and wrist.  In response, Prison staff placed Mr. Brandemihl in Locked Housing.  In an e-mail dated July 8, 2014, Prison staff wrote, "the mental health department feels [Mr. Brandemihl] knowingly, willingly, and purposely engaged in self-harm behavior and should be held accountable for his actions."

86.     Later that month, Mr. Brandemihl again tried to commit suicide by chewing through his arm and wrist and taking approximately 50 multivitamin tablets.  On that same day, corrections officers observed Mr. Brandemihl drinking out of the toilet in his cell after he had fallen and hit his head on it.  Rather than prescribe mental health treatment for Mr. Brandemihl, Prison officials placed him on a BMP for "hindering" prison staff and once again sent him to a Locked Housing unit.  Prison records show that the "hindering" charge was based on the fact that attending to Mr. Brandemihl's suicide attempt "caused the day to day operations of the unit to fall behind schedule."

87.     Medical records indicate that Mr. Brandemihl informed the medical professional who treated him at Deer Lodge Hospital following this incident that he bit his wrists and tried to suck his own blood "out of fear of metals in his blood." These records also show that Deer Lodge Hospital recommended that Mr. Brandemihl receive "psychiatric follow up at the prison."

88.     At his subsequent disciplinary hearing, Mr. Brandemihl was found guilty of infractions for engaging in self-harm and for obstructing and hindering prison staff. He was sentenced to 11 days in Locked Housing.

89.     On August 4, 2014, a doctor treating Mr. Brandemihl observed that he suffered from "apparent persecutory delusions" and requested that his mental health be assessed "ASAP." According to prison records, the only action taken was to send a "mental health technician" to perform a wellness check on Mr. Brandemihl.

90.     On September 23, 2014, Mr. Brandemihl was found sleeping in his cell near a plastic bag filled with blood. He refused to be handcuffed when directed by the corrections officers. Instead, he began flushing objects down the toilet in his cell. As a result, he was again transferred to Locked Housing and placed in solitary confinement.

91.     Shortly thereafter, Mr. Brandemihl was found dead in his Locked Housing cell. Although the official cause of death has not been released, prison

records indicate his body was found on the floor "laying in a pool of blood under his blankets."  When prison staff found Mr. Brandemihl's body, they noted the blood on the floor had dried, his skin was cold, and rigor mortis had already begun to set in, all of which indicated he had been dead for several hours.

92.    The Defendants are well-aware that the Prison's treatment and care of prisoners with serious mental illness does not satisfy constitutional requirements. In its 2003 decision in *Walker v. State*, 2003 MT 134, 316 Mont. 103, 68 P.3d 872 (Mont. 2003), the Montana Supreme Court made it very clear that the Prison has a constitutional obligation to provide prisoners with appropriate mental health treatment and to eliminate disciplinary practices that exacerbate prisoners' mental illnesses.  The Court concluded that the Prison's "behavior management plans" and living conditions constitute cruel and unusual punishment when they exacerbate the prisoner's mental health condition.

93.    In 2009, the DOC faced another lawsuit, *Katka v. State*, No. BDV 2009-1163 (1ˢᵗ Jud. Dist. Ct., Lewis and Clark Co.) challenging the Prison's treatment and discipline practices for juveniles with mental illness.  The DOC resolved *Katka* by entering into a 2012 settlement agreement requiring the Prison to implement changes regarding its housing and treatment of prisoners with serious mental illness and treatment of suicidal prisoners.  Throughout discovery in that

case, Prison officials heard from mental health experts addressing the deficiencies in the Prison's use of solitary confinement and inadequate mental health treatment.

94.     In addition, Prisoners with serious mental illness regularly request and grieve the level of mental health care they are provided, including the negative impact of isolation, mental health staff discontinuing their needed medications and mental health staff ignoring previous diagnoses.  In 2012 alone, a Prison staff member publicly stated that mental health staff answered over 2,000 mental health requests.  Several prisoners have appealed the inadequacy of the mental health treatment they receive to the Prison Warden and ultimately to the DOC Director.

95.     In addition, DRM has repeatedly informed Prison officials of the serious deficiencies in the Prison's treatment of prisoners with serious mental illness.

96.     On February 26, 2014, DRM sent Director Batista a letter describing many of the facts alleged in this Second Amended Complaint.  To DRM's knowledge, to date, the DOC Defendants have not made any modifications in their treatment of prisoners with serious mental illness.

97.     Given their knowledge of these practices, and their knowledge of the serious harm that can be caused by these practices,  and their refusal to change these practices, the DOC Defendants have been deliberately indifferent to the

serious medical needs of prisoners with serious mental illness at the Montana State Prison.

## PRAYER FOR RELIEF

**WHEREFORE, plaintiff Disability Rights Montana, Inc. prays for an order and judgment in which this Court:**

A.      Exercises continuing jurisdiction over this action;

B.      Issues declaratory judgment that the DOC Defendants' acts violate the Eighth Amendment to the U.S. Constitution, and that these acts and omissions continue to cause an ongoing risk of the violation of those rights;

C.      Issues injunctive relief to stop the constitutional violations described above, including injunctive relief that:

      1.      Requires the DOC Defendants to take immediate steps to ensure that individuals with serious mental illness incarcerated at the Montana State Prison receive constitutionally adequate mental health care;

      2.      Enjoins the DOC Defendants from placing prisoners with serious mental illness in solitary confinement;

D.      Retains jurisdiction of this case until the DOC Defendants have fully complied with the orders of this Court, and there is a reasonable assurance that the DOC Defendants will continue to comply in the future absent continuing jurisdiction;

E.      Awards reasonable attorneys' fees, litigation expenses, and costs

pursuant to 42 U.S.C. § 1988 and 42 U.S.C. § 12205; and

F.      Orders all other relief the Court deems appropriate.


Respectfully submitted this 8<u>th</u> day of May, 2015.

*s/Jeffrey A. Simmons*
Jeffrey A. Simmons (*Pro Hac Vice*)
Foley & Lardner LLP
150 East Gilman Street
Madison, WI  53703-1482
Telephone:  (608) 258-4267
Email:  jsimmons@foley.com


*s/Jon E. Ellingson*
Jon E. Ellingson
James Park Taylor
ACLU of Montana
241 E. Alder
Missoula, MT  59807
Telephone:  (406) 549-6159
Email:  jpt42@hotmail.com
          jonelling@gmail.com


Anna Conley
Attorney At Law
P.O. Box 9101
Missoula, MT  59807
Telephone:  (406) 830-0367
Email:  anna@annaconley.com

Kyle A. Gray
Adrian A. Miller
Holland & Hart LLP
401 N. 31st Street, Suite 1500
Billings, MT  59101-1277
Telephone:  (406) 252-2166
Email:  kgray@hollandandhart.com
          aamiller@hollandhart.com